158 P.3d 27 (2007)
STATE of Washington, Respondent,
v.
John Nicholas ATHAN, Appellant.
No. 75312-1.
Supreme Court of Washington, En Banc.
Argued January 26, 2006.
Decided May 10, 2007.
*30 John Rolfing Muenster, Muenster & Koenig, Seattle, WA, for Appellant.
Catherine Marie Mcdowall, King County Prosecutor's Office, Seattle, WA, for Respondent.
Sheryl Gordon McCloud, Law Offices of Sheryl Gordon McCloud, Seattle, WA, John Wesley Hall, Little Rock, AR, for Amicus Curiae on behalf of Washington Association of Criminal Defense Lawyers and National Association of Criminal Defense Lawyers.
Fredric Tausend, Theodore J. Angelis, Kirkpatrick & Lockhart Preston Gates Ellis, Seattle, WA, Stanley Brooke Taylor, Port *31 Angeles, WA, for Amicus Curiae on behalf of Washington State Bar Association.
Douglas B. Klunder, Seattle, WA, for Amicus Curiae on behalf of American Civil Liberties Union of Washington.
C. JOHNSON, J.
ś 1 John Nicholas Athan, appeals his conviction for second degree murder, arguing the case presents unique and fundamental issues of broad public import. Athan first argues his DNA (deoxyribonucleic acid) was collected in violation of both the United States and Washington State Constitutions when Seattle Police Department detectives, posing as a fictitious law firm, induced Athan to mail a letter to the firm, from which Athan's DNA sample was extracted. Second, Athan argues the actions of the police detectives were illegal and unfairly prejudiced his right to a fair trial, requiring dismissal of the case under CrR 8.3(b). Athan asks this court to reverse his conviction and remand the case with instructions to dismiss with prejudice. In the alternative, Athan argues the trial court erred in several evidentiary rulings and asks this court to remand for a new trial with instructions to exclude certain evidence. We find the collection of Athan's DNA did not violate the state or federal constitution, the actions of the police did not require dismissal under CrR 8.3(b), and the trial court did not err in its evidentiary rulings. The conviction of the appellant is affirmed.

FACTUAL AND PROCEDURAL HISTORY
ś 2 On November 12, 1982, Seattle police officers found the body of 13-year-old Kristen Sumstad inside a cardboard box in the Magnolia neighborhood of Seattle. Except for a pair of socks, Sumstad's body was nude from the waist down and a ligature was found around her neck. Although no DNA was found under her fingernails, semen was found in Sumstad's vagina and on her leg. An autopsy also revealed microscopic hemorrhaging or bruising in Sumstad's anus, bruising and contusions on Sumstad's face, neck, and legs, and a possible abrasion on her labia. The medical examiner estimated that Sumstad had died between 8 to 24 hours before her body was discovered. Verbatim Report of Proceedings (VRP) (Jan. 12, 2004) at 76.
ś 3 The area where Sumstad's body was found, an alley behind a television store, was a hangout of local neighborhood teenagers, including Sumstad and the appellant, John Nicholas Athan. Police claim Athan's brother reported seeing Athan transporting a "large box" on a "grocery cart" near the area where Sumstad was found. VRP (Jan. 13, 2004) at 126. Athan told police that he had been in the neighborhood stealing firewood the night before Sumstad's body was found. VRP (Jan. 13, 2004) at 125-26. Although the police investigated leads related to Athan, he was not charged, and the crime remained unsolved.
ś 4 Twenty years later, the Seattle Police Department's (SPD) cold case detectives unit reexamined the case and sent preserved biological evidence from the crime scene to the Washington State Patrol Crime Lab. Advances in DNA analysis allowed the lab to isolate a male DNA profile. The profile was tested against state and federal databases, but no match was found. Because Athan had been a suspect at the time of the original investigation, detectives decided to locate his whereabouts and collect a DNA sample for comparison.
ś 5 The detectives located Athan in New Jersey and also determined, because Athan had family in Greece, he represented a flight risk. The detectives invented a ruse to obtain Athan's DNA without making Athan aware they had resumed investigating Sumstad's murder. Posing as a fictitious law firm, the detectives sent Athan a letter inviting him to join a fictitious class action lawsuit concerning parking tickets. The letterhead contained the names of the "attorneys," all of whom were employed by the SPD. Believing the ruse to be true, Athan signed, dated, and returned the enclosed class action authorization form and attached a hand-written note stating, "if I am billed for any of your services disregard my signature and my participation completely." Ex. 53.
*32 ś 6 Athan's reply was received by Detective Diaz, one of the "attorneys" listed on the letterhead. Without opening it, Diaz gave the letter to another detective who forwarded it to the crime lab. A lab technician opened the letter, removed and photographed the contents, cut off part of the envelope flap, and obtained a DNA profile from saliva located on the flap. The DNA profile from the envelope matched the DNA profile from the semen found on Sumstad's body. Based primarily on the results of the DNA testing, the prosecuting attorney filed an information and probable cause statement to secure an arrest warrant for Athan.
ś 7 After obtaining the warrant, two detectives flew to New Jersey to arrest Athan. After reading Athan his Miranda[1] rights, but before arresting him or advising him they already had an arrest warrant for him, the detectives questioned Athan about Sumstad's murder. Athan denied ever having sex with Sumstad or using a grocery cart to carry a box on the night of the murder. VRP (Jan. 13, 2004) at 125-26. Athan admitted to using a handcart to steal firewood from a neighbor in the area on the night before the body was found. VRP (Jan. 13, 2004) at 125. When detectives asked Athan for a DNA sample, he stated, "I don't like where this is going," and "maybe I should call my attorney." Clerk's Papers (CP) at 253; VRP (Nov. 19, 2003) at 75. The interview ceased and the detectives arrested Athan pursuant to the arrest warrant. The detectives obtained a second DNA sample from Athan pursuant to a search warrant. The second DNA sample matched the sample from the envelope and from Sumstad's body.
ś 8 The State filed first degree murder charges against Athan. Athan made several pretrial motions, including suppression of the DNA evidence and dismissal of the case under State v. Knapstad, 41 Wash.App. 781, 706 P.2d 238 (1985), aff'd, 107 Wash.2d 346, 729 P.2d 48 (1986), and dismissal under CrR 8.3(b) based on RCW 2.48.180 (unlawful practice of law), RCW 9.73.020 (opening sealed letter), due process, and public policy. The trial court denied all of the motions. Additionally, at the end of the State's case, Athan moved for dismissal which the trial court also denied. Athan was found guilty of second degree murder and sentenced to 10 to 20 years under pre-sentencing reform act guidelines. We granted direct review of Athan's appeal.

ISSUES PRESENTED
I. Did the detectives violate the state or federal constitution when they obtained a sample of Athan's DNA without a warrant?
II. Did the trial court err when it denied Athan's motion to dismiss under CrR 8.3(b)?
III. Did the trial court err when it denied Athan's other evidentiary motions?

ANALYSIS

I. Did Detectives Violate the State or Federal Constitution when they Obtained Athan's DNA without a Warrant?
ś 9 When presented with arguments under both the state and federal constitutions, we review the state constitution arguments first. State v. Carter, 151 Wash.2d 118, 125, 85 P.3d 887 (2004). Under the Washington Constitution, it is well established that article I, section 7 qualitatively differs from the Fourth Amendment to the United States Constitution, and in some areas provides greater protections than does the federal constitution. State v. McKinney, 148 Wash.2d 20, 29, 60 P.3d 46 (2002). Accordingly, a Gunwall[2] analysis is unnecessary to establish that this court should undertake an independent state constitutional analysis.[3] *33 State v. Jackson, 150 Wash.2d 251, 259, 76 P.3d 217 (2003); McKinney, 148 Wash.2d at 26, 60 P.3d 46.
ś 10 The only relevant question is whether article I, section 7 affords enhanced protection in the particular context. McKinney, 148 Wash.2d at 26-27, 60 P.3d 46.

A. Article I, Section 7
ś 11 Article I, section 7 reads "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law" and requires a two-step analysis: was there a disturbance of one's private affairs and, if so, was the disturbance authorized by law. In re Pers. Restraint of Maxfield, 133 Wash.2d 332, 339, 945 P.2d 196 (1997). Athan argues this case involves three matters that are "private affairs" under Washington law: one's body and bodily functions; communications with a person one believes is an attorney; and sealed correspondence intended for one's attorney. We examine each of these claims separately to determine if any one of them constitutes a "private affair" under our state constitution.
ś 12 The term "private affairs" generally means "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass." State v. Myrick, 102 Wash.2d 506, 511, 688 P.2d 151 (1984). In determining if an interest constitutes a "private affair," we look at the historical treatment of the interest being asserted, analogous case law, and statutes and laws supporting the interest asserted. Voluntary exposure to the public is relevant to our inquiry and can negate an asserted privacy interest. State v. McKinney, 148 Wash.2d 20, 29, 60 P.3d 46 (2002).

1. Body and Bodily Functions
ś 13 Athan argues that case law and statutory law require us to recognize a privacy interest in one's body and bodily functions. Division One of the Court of Appeals has held, "[t]here is thus no doubt that the privacy interest in the body and bodily functions is one Washington citizens have held, and should be entitled to hold, safe from governmental trespass." Robinson v. City of Seattle, 102 Wash.App. 795, 819, 10 P.3d 452 (2000). Robinson involved a challenge to a pre-employment urinalysis drug testing program, which the court partially invalidated. The appellate court noted the testing was highly invasive in the taking of the sample, the chemical analysis of its contents, and the possible disclosure of explanatory medical conditions or treatments. Robinson, 102 Wash.App. at 822, 10 P.3d 452. Athan submits that all three of the appellate court's concerns are present here. Athan also argues that, except for convicted felons under RCW 43.43.754 and court ordered parentage tests under RCW 26.26.400, no person is subject to DNA testing without consent in the state of Washington.
ś 14 The State distinguishes Robinson by arguing the drug-testing program in that case involved the nonconsensual taking of urine samples. The statutes, likewise, are distinguishable because they involve the taking of biological samples by force. In this case, the State argues, Athan voluntarily relinquished his DNA when he licked the envelope and mailed it to a third party. The State maintains that DNA obtained from one's saliva is akin to a person's physical description, appearance, or other characteristic voluntarily exposed to the public, thus, it is not a "private affair" at all. See, e.g., State v. Carter, 151 Wash.2d 118, 126, 85 P.3d 887 (2004).
ś 15 We find there is no inherent privacy interest in saliva. Certainly the nonconsensual collection of blood or urine samples in some circumstances, such as under the facts of Robinson, invokes privacy concerns; however, obtaining the saliva sample in this case did not involve an invasive or involuntary procedure. The relevant question in this case is whether, when a person licks an envelope and places it in the mail, that person retains any privacy interest in his saliva at all. Unlike a nonconsensual sampling situation, there was no force involved in obtaining Athan's saliva sample here. The facts of this situation are analogous *34 to a person spitting on the sidewalk or leaving a cigarette butt in an ashtray. We hold under these circumstances, any privacy interest is lost. The envelope, and any saliva contained on it, becomes the property of the recipient.
ś 16 Amicus[4] American Civil Liberties Union (ACLU) argues DNA has the potential to reveal a vast amount of personal information, including medical conditions and familial relations, therefore DNA should constitute a privacy interest. While this may be true in some circumstances, the State's use of Athan's DNA here was narrowly limited to identification purposes. What was done with the letter, including DNA testing for the limited purpose of identification, was not within the sender's control. The concerns raised by the ACLU, while valid, are not present in this case. The State used the sample for identification purposes only, not for purposes that raise the concerns advanced by the ACLU.

2. Communications with a Person one Believes is an Attorney
ś 17 Athan argues Washington law provides a strong privacy protection of communications between attorneys and their clients. See RCW 5.60.060(2)(a). Although the police officers here were not actually attorneys, they held themselves out as attorneys, in violation of RCW 2.48.180(2)(a). Athan contends he reasonably relied on the detectives' representations that they were attorneys, and thus he should be entitled to rely on the attorney-client privilege to protect his communications as a "private affair."
ś 18 The State argues the saliva used to seal the envelope was not a communication and therefore not protected by the attorney-client privilege. The communication, if any, would have been the enclosed letter, which the State notes Athan never moved to suppress at trial. Finally, the letter contained a handwritten note stating, "[i]f I am billed for any of your services disregard my signature and my participation completely." Ex. 53. The State suggests this added condition of not wanting to be billed by the "firm" is evidence Athan did not intend to form an attorney-client relationship at that time; instead, he sought merely to preserve his chance to be involved in the lawsuit at some future date.
ś 19 As the State notes, Athan did not object to the letter, or its contents, being admitted during the trial. Thus, we need only decide if the saliva on the envelope flap is a "communication" subject to protection by the attorney-client privilege. Because we find saliva is not a communication in this case, we do not need to decide if an attorney-client relationship was even established. We note this case is not about police intercepting mail addressed to someone else. The envelope, its contents, and the saliva contained on it, were addressed to and received by the SPD detectives, albeit through the use of a ruse.
ś 20 When there is no statutory definition to guide us, words should be given their ordinary meaning. Often, we rely on dictionaries to supply the ordinary meaning. State v. Gurske, 155 Wash.2d 134, 145, 118 P.3d 333 (2005) (Sanders, J., concurring). "[C]ommunication" may be defined as "[t]he expression or exchange of information by speech, writing, or gestures." Black's Law Dictionary 296 (8th ed.2004). Under the facts of this case, Athan's saliva was merely a means by which he could seal the envelope. There was no intent or expectation on Athan's part that his saliva would be an expression or exchange of information. Although the State was ultimately able to gain information from the saliva, it does not mean the saliva was a "communication" as it is ordinarily defined.
ś 21 Athan argues he was entitled to rely on the SPD representation that they were attorneys and thus anything sent to them would be protected by the attorney-client privilege. Relying on RCW 5.60.060(2)(a), regarding attorney-client privilege, *35 and RCW 2.48.180(2)(a), regarding unlawful practice of law, and case law, Athan contends police officers posing as attorneys is a ruse strictly prohibited by both Washington law and the law of evidence in general.
ś 22 The State distinguishes Athan's cited cases by noting the cases all involved actual communications. In State v. Cory, 62 Wash.2d 371, 382 P.2d 1019 (1963), jail officers eavesdropped on conversations between the defendant and his attorney. In State v. Granacki, 90 Wash.App. 598, 959 P.2d 667 (1998), a police detective intentionally read a legal pad containing privileged notes between the defendant and his attorney. Thus, the State contends, neither case is on point because the facts here do not involve police obtaining actual attorney-client communications. The State also distinguishes People v. Barker, 60 Mich. 277, 27 N.W. 539 (1886) (detective posed as criminal defense attorney to obtain statements from the defendant) and State v. Russell, 83 Wis. 330, 53 N.W. 441 (1892) (prosecutor posed as defendant's attorney in order to obtain statements about the case) because those cases involved the receipt of privileged information.
ś 23 We find there is no absolute prohibition of police ruses involving detectives posing as attorneys in the state of Washington. While such a ruse has the potential to gather privileged and confidential information, thereby implicating the concerns raised by Athan and amici, that was not the case here. First, we have already found the saliva on the envelope was not a communication. Second, the letter sent to Athan did not ask Athan to provide additional or confidential information. Thus, the detectives were not seeking a confidential communication and the risk of receiving such a communication was minimal. Unlike Barker and Russell, the ruse was not designed to obtain statements or other confidential information about the Sumstad murder; the goal of the ruse was only to induce Athan to mail an envelope. The use of the ruse did not violate a private affair protected by article 1, section 7.
ś 24 We find further support for police posing as an attorney in the analogous case of State v. Townsend, 147 Wash.2d 666, 57 P.3d 255 (2002). In Townsend, a Spokane police officer, posing as a 13-year-old girl, engaged in on-line communications with the defendant, Townsend. The police officer saved and later printed the communications for use as evidence against Townsend. Townsend argued the police detective's actions violated Townsend's privacy rights under a similar provision of the state privacy act. In upholding his conviction, we found the communications were private, but that Townsend impliedly consented to the recording of his private email conversations because it was reasonable to infer Townsend was aware it was possible to record the messages. Townsend, 147 Wash.2d at 674-79, 57 P.3d 255. Like Townsend, who presumably was not aware his emails were being sent to and recorded by a police detective for use as evidence against him, Athan impliedly consented to the receipt of his saliva because he mailed it. The fact that he was not aware the recipient was a police detective does not vitiate that consent.
ś 25 As we note in our discussion of Athan's CrR 8.3(b) motion, police officers are allowed to use some deception, including ruses, for the purpose of investigating criminal activity. Generally, ruses are upheld as long as the actions do not violate a defendant's due process rights. Because we agree with the trial court that the police ruse used here did not violate Athan's due process rights, we find this ruse permissible.

3. Sealed Correspondence
ś 26 Finally, Athan argues that, under RCW 9.73.020, his letter was protected. Athan relies on State v. Christensen, 153 Wash.2d 186, 198, 102 P.3d 789 (2004), to argue the state privacy act protects "sealed messages, letters, and telegrams from being opened or read by someone other than the intended recipient." According to Athan, a law firm was his intended recipient, not the police. Because the police were not the intended recipients, he argues they violated the act by opening the letter and, at the same time, violated his privacy rights.
ś 27 The State argues the letter was in fact opened by the intended recipient because it was opened by the detectives listed in the "law firm's" letterhead or by their agents. *36 The State finds it immaterial that the persons designated in the letterhead were detectives and not attorneys.
ś 28 RCW 9.73.020 reads, "[e]very person who shall wilfully open or read, or cause to be opened or read, any sealed message, letter or telegram intended for another person, or publish the whole or any portion of such a message, letter or telegram, knowing it to have been opened or read without authority, shall be guilty of a misdemeanor." Nothing in the statute indicates the intended recipient must be who the recipient actually claims to be. The detective who actually received the letter was listed on the "law firm" letterhead and thus, under the state privacy act, had authority to open or cause to be opened, the letter. Since the letter was received by the intended addressee, though not an attorney as Athan believed, he has failed to establish a statutory violation.
ś 29 We are again reminded of Townsend. Townsend argued the police detective's actions violated Townsend's privacy rights under a similar provision of the state privacy act. In upholding his conviction, we found the communications were private, but that Townsend impliedly consented to the recording of his private e-mail conversations because it was reasonable to infer Townsend was aware it was possible to record the messages. Notably, our holding did not turn on Townsend's subjective belief he was communicating with a child and not a police detective. Townsend, 147 Wash.2d at 674-79, 57 P.3d 255. Similarly, Athan's privacy act claim here does not turn on his subjective belief he was corresponding with a law firm. The detectives listed on the letterhead were the intended recipients of the letter; their actual occupation is immaterial for the purposes of RCW 9.73.020.
ś 30 Having found there is no privacy interest in saliva after it has been voluntarily placed on an envelope and relinquished to a recipient; the act of placing saliva on an envelope to seal the envelope does not constitute a "communication" under the ordinary meaning of the word; and the police did not violate RCW 9.73.020 because the detective named on the letterhead was the intended recipient, we conclude Athan's private affairs were not disturbed under article I, section 7. We now examine if his rights were violated under the Fourth Amendment.

B. Fourth Amendment
ś 31 The Fourth Amendment reads, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Athan asserts two privacy rights were violated under the federal constitution: bodily privacy and privacy of the mail. Each asserted right will be analyzed to determine if a search occurred, and if so, if the search was unreasonable under the Fourth Amendment.
ś 32 There is no United States Supreme Court opinion directly addressing this issue so we apply established Fourth Amendment principles to guide our analysis. A Fourth Amendment search does not occur unless there is a subjective manifestation of privacy in the object searched and society recognizes that privacy interest is reasonable. Kyllo v. United States, 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). Additionally, the Fourth Amendment protects against unreasonable searches. Reasonableness is determined by examining the totality of the circumstances, including the degree to which the search intrudes upon an individual's privacy and the degree to which the search is needed for the promotion of legitimate governmental interests. United States v. Knights, 534 U.S. 112, 118-19, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). Thus, a Fourth Amendment violation occurs only when there is a reasonable privacy interest protected and the search of that interest is unreasonable in light of all the circumstances.

1. Bodily Privacy
ś 33 Athan argues the collection and analysis of biological samples from an individual constitutes a search under the Fourth Amendment. He contends that because the letter and, consequently, his DNA were obtained *37 and examined without a warrant, they were unreasonable searches and thus, in violation of Fourth Amendment protections.
ś 34 The State argues Athan had no reasonable expectation of privacy in his saliva when he voluntarily placed it on an envelope and mailed it. The State also argues the use of the police ruse here did not vitiate the voluntary nature of Athan's surrender of his saliva.
ś 35 While case law exists supporting Athan's assertion that forcible collection of bodily fluids constitutes a search under the federal constitution, see, e.g., Vernonia School Dist. 47J v. Acton, 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), no cases have been cited dealing with the voluntary relinquishment of a bodily fluid which is collected without force or invasion and analyzed by the government. Similar to our state constitution approach, the question under the Fourth Amendment is whether persons retain a reasonable expectation of privacy in their saliva after they lick an envelope and place it in the mail. We find no cases or support for such a conclusion. Police may surreptitiously follow a suspect to collect DNA, fingerprints, footprints, or other possibly incriminating evidence, without violating that suspect's privacy. No case has been cited challenging or declaring this type of police practice unreasonable or unconstitutional. People constantly leave genetic material, fingerprints, footprints, or other evidence of their identity in public places. There is no subjective expectation of privacy in discarded genetic material just as there is no subjective expectation of privacy in fingerprints or footprints left in a public place. Physical characteristics which are exposed to the public are not subject to Fourth Amendment protection. United States v. Mara, 410 U.S. 19, 21, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973). The analysis of DNA obtained without forcible compulsion and analyzed by the government for comparison to evidence found at a crime scene is not a search under the Fourth Amendment. See State v. Coleman, 122 Ariz. 130, 593 P.2d 684, 687 (Ct.App.1978) (finding analysis of shoe soles does not constitute Fourth Amendment search because the "[e]xamination of such physical characteristics `involves none of the probing into an individual's private life and thoughts that marks an interrogation or search'" (quoting Davis v. Mississippi, 394 U.S. 721, 727, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969))).

2. Mail
ś 36 Athan argues he had a reasonable expectation of privacy in the envelope he mailed to the "law firm." He relies on Ex Parte Jackson, 96 U.S. 727, 733, 24 L.Ed. 877 (1877), and United States v. Van Leeuwen, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970) for the proposition that sealed letters and packages cannot be searched without a warrant.
ś 37 The State argues, as it did in the state constitution claim, no violation exists because the detective who received the letter was named in the letterhead and thus, was an intended recipient of the envelope. The State distinguishes the cases relied on by Athan because here the SPD did not intercept and search the contents of a letter being sent to a third party. It is of no consequence that Athan did not know the intended recipient was a detective and not a lawyer, according to the State.
ś 38 The Fourth Amendment protects a person's privacy interests in the contents of sealed letters and documents sent through the mail. See e.g., Van Leeuwen, 397 U.S. at 251, 90 S.Ct. 1029. However, a similar analysis from Athan's state constitution mail claim applies here. The detectives were listed on the envelope as the intended recipients; no interception of the letter while it was in transit to a third party occurred. There is no Fourth Amendment violation when, as here, the police open and analyze a sealed letter addressed to one or more of their detectives.

II. Did the Trial Court Err when it Denied Athan's Motion To Dismiss under CrR 8.3(b)?
ś 39 CrR 8.3(b) reads, "[t]he court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental *38 misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." We review the trial court's decision under an abuse of discretion standard. Abuse of discretion requires the trial court's decision to be manifestly unreasonable or based on untenable grounds or untenable reasons. State v. Michielli, 132 Wash.2d 229, 240, 937 P.2d 587 (1997). Here, the trial court, in a written opinion, discussed the public policy of allowing some deceitful police conduct in order to detect and eliminate criminal activity. The court distinguished the facts of this case from other attorney-client cases because the police were not hoping to obtain confidential information, rather they were trying to obtain a sample of saliva. The court denied Athan's motion to dismiss because, after looking at a totality of the circumstances, it found the police were acting to protect the public by solving the crime, the illegal activity engaged in was only a misdemeanor, and the police conduct was not repugnant to a sense of justice.
ś 40 Athan argues his case should be dismissed under CrR 8.3(b) and the due process clauses of the state and federal constitutions. Athan notes the rule requires two elements: governmental misconduct and prejudice affecting the defendant's right to a fair trial. Athan maintains governmental misconduct is shown through the SPD's violation of RCW 2.48.180(2)(a), unlawful practice of law, and RCW 9.73.020, privacy in sealed letters. In addition, Athan argues the case should be dismissed for public policy reasons. Athan, along with amicus WSBA, contends the ruse used by police created an attorney-client relationship because Athan believed the "law firm" would be representing him in a class action lawsuit. Athan and the WSBA contend public policy allows for some deceitful conduct only when it is necessary to detect criminal activity and the specific ruse used here was not necessary to obtain the evidence the SPD wanted. Based on the strong interest in protecting the public's faith in the attorney-client relationship, Athan argues public policy requires dismissal of the case.
ś 41 The State contends dismissal for a due process violation requires the additional element of showing the government misconduct is "so shocking that it violates fundamental fairness." State v. Lively, 130 Wash.2d 1, 19, 921 P.2d 1035 (1996). Dismissal is appropriate only in the most egregious of cases, such as where the government agents direct a crime from beginning to end or a crime is fabricated for the sole purpose of obtaining a conviction and not to protect the public from criminal behavior. Lively, 130 Wash.2d at 20-21, 921 P.2d 1035. The State notes Washington courts have repeatedly rejected outrageous conduct claims based on police engaging in illegal activities. See, e.g., State v. Myers, 102 Wash.2d 548, 689 P.2d 38 (1984), overruled on other grounds by Lively, 130 Wash.2d 1, 921 P.2d 1035. Thus, while the State concedes the police conduct was perhaps deceitful, it was not so outrageous as to warrant dismissal of the entire case. The State observes the police ruse was not designed to solicit any privileged information and, in fact, none was communicated by Athan.
ś 42 Public policy allows for a limited amount of deceitful police conduct in order to detect and eliminate criminal activity. A violation of a criminal statute is not a per se violation of CrR 8.3(b) and/or due process, and we must examine the totality of the circumstances to determine when the conduct becomes so outrageous that a reversal of a conviction is required. The police's use of a ruse to obtain evidence against a suspect is not determinative. We have upheld police ruses designed to gain warrantless entry into a suspect's house for the purpose of buying illegal drugs. State v. Hastings, 119 Wash.2d 229, 830 P.2d 658 (1992). In Hastings, we found the Fourth Amendment did not apply because the defendant had no reasonable expectation of privacy in his house when he was openly engaged in illegal activity with the public. However, we noted that even if the Fourth Amendment had applied, the defendant had consented to the search and the police ruse used to gain entry did not vitiate that consent. Hastings, 119 Wash.2d at 233-36, 830 P.2d 658. Likewise, there is no Fourth Amendment violation here and the police ruse does not vitiate Athan's voluntary relinquishment of the envelope containing a sample of his saliva. Although the police *39 violated a state statute by posing as lawyers, the trial court noted the effect of the conduct on the integrity of the legal system is not as severe as where the ruse was directed at obtaining confidential information. Public policy allows for some deceitful conduct and violation of criminal laws by police officers in order to detect and eliminate criminal activity. The claimed misconduct in this case does not involve actions similar to those cases which found misconduct warranting dismissal. The police did not induce Athan to commit any crime here nor did they attempt to gain any confidential information from the ruse. The conduct here is not so outrageous as to offend a sense of justice or require dismissal of this case. We find the trial court properly denied Athan's motion to dismiss under CrR 8.3(b).

III. Did the Trial Court Err when it Denied Athan's Other Evidentiary Motions?
ś 43 In addition to his DNA claims, Athan raised four evidentiary issues on appeal. He claims the trial court erred by denying his motion to dismiss for insufficiency of the evidence; admitting statements he made at the time of his arrest; admitting hearsay statements made by the decedent about Athan; and admitting statements made by Athan's brother, James, to police during the original investigation.

A. Sufficiency of the Evidence
ś 44 Athan argues the State failed to produce sufficient evidence to prove he was guilty beyond a reasonable doubt.[5] Athan maintains the evidence establishes only that he had a sexual encounter with the victim, Kristen Sumstad, at some point during the 24 hours preceding her death. However, according to Athan, the fact of sexual intercourse is insufficient to show Athan killed Sumstad. Athan argues there was no testimony that the intercourse occurred concurrently with the death, no testimony placing Athan at the scene of the crime on the morning the body was found, and no testimony placing Athan with the victim in the days immediately preceding her death. Athan also notes there was no DNA evidence found on the ligature used to strangle Sumstad nor was any found under her fingernails. Finally, Athan contends the evidence showed he was a pleasant, hard-working boy who was dating the victim's older sister.
ś 45 The State argues the evidence was not only sufficient as to Athan's guilt, it was overwhelming. The State notes that for a sufficiency of the evidence challenge, a reviewing court must view the evidence in the light most favorable to the State. Only if the court finds no rational trier of fact could have found guilt beyond a reasonable doubt will the conviction be overturned for insufficiency of the evidence. State v. Ward, 148 Wash.2d 803, 815, 64 P.3d 640 (2003). The State argues the evidence showed sexual intercourse between Athan and Sumstad near the time of the murder and the body was found near Athan's residence in a place he was known to frequent. In addition, Sumstad's body showed evidence of a sexual assault and the semen found on the body conclusively matched Athan's DNA where Athan repeatedly denied having a sexual relationship with the victim both during the initial investigation and 20 years later when questioned in New Jersey.
ś 46 We find that, when viewing the evidence in the light most favorable to the State, the evidence was sufficient such that a reasonable jury could have found Athan guilty beyond a reasonable doubt. The trial court properly denied each of Athan's motions to dismiss based on the sufficiency of the evidence.

B. Athan's Statements
ś 47 Athan argues statements made prior to his arrest in New Jersey should have been suppressed. He contends his Sixth Amendment right to counsel had attached because, although he was not aware of it, he had been formally charged with first degree *40 murder and he was indisputably in police custody. Although the police read Athan his Miranda rights, Athan refused to sign a waiver of those rights. He relies primarily on United States v. Heldt, 745 F.2d 1275 (9th Cir.1984), for the proposition that refusal to sign a waiver form is an indication that a person wishes to remain silent. He argues he did not waive his rights, thus, any statements made to the police were admitted at trial in violation of the Sixth Amendment.
ś 48 The State argues Athan made a voluntary, knowing, and intelligent waiver of his Miranda rights when he voluntarily answered police questions and, after being asked for a DNA sample, unequivocally invoked his Miranda rights. The State maintains that refusal to sign a waiver is not dispositive of the waiver issue and courts also look to evidence of coercion or threats on the part of the police. See, e.g., State v. Rupe, 101 Wash.2d 664, 678, 683 P.2d 571 (1984). In addition, the Ninth Circuit Court of Appeals later distinguished Heldt on the grounds that there were a number of other circumstances indicating the statements were not voluntarily made. United States v. Andaverde, 64 F.3d 1305, 1313-14 (1995). Here, the State contends, there was no evidence or allegation of police coercion and Athan later invoked his rights, suggesting he was aware that he had not previously invoked them.
ś 49 The State bears the burden of showing a knowing, voluntary, and intelligent waiver of Miranda rights by a preponderance of the evidence. Refusal to sign a waiver may cast doubt on the State's assertion of waiver; however, it is not dispositive of the issue because the trial court must review the totality of the circumstances. State v. Parra, 96 Wash.App. 95, 99-100, 977 P.2d 1272 (1999). We will not disturb a trial court's conclusion that a waiver was voluntarily made if the trial court found, by a preponderance of the evidence, that the statements were voluntary and substantial evidence in the record supports the finding. See State v. Broadaway, 133 Wash.2d 118, 129, 942 P.2d 363 (1997). There is no evidence that the detectives coerced Athan into answering their questions and Athan's subsequent invocation of his Miranda rights supports a finding that he knowingly, voluntarily, and intelligently waived his right to remain silent prior to that point.

C. Decedent's Statements
ś 50 During trial, Athan objected to the testimony of state witnesses Terri Droll Presnell and Kimberly Alguard, who both testified to statements made by the victim, Sumstad, about Athan. Presnell testified that when she teased Sumstad about Athan's romantic interest in Sumstad, Sumstad replied "no way," that she (the decedent) would not go out with him, and it was a joke. VRP (Jan. 14, 2004) at 27. Alguard testified that three or four days before Sumstad's body was discovered, Sumstad told Alguard, in reference to Athan, "this guy gives me the creeps." VRP (Jan. 15, 2004) at 84. The trial court overruled the objections and allowed the statements into evidence under the state of mind exception to the hearsay rule. Athan argues it was error to allow the statements because the state of mind exception to the rule does not apply and because the statements violate his Sixth Amendment confrontation rights.

1. Hearsay
ś 51 Athan argues the state of mind exception to the hearsay rule, ER 803(a)(3), applies only when the declarant's state of mind is at issue. In homicide cases, this requires a defense of either accident or self-defense. State v. Parr, 93 Wash.2d 95, 103, 606 P.2d 263 (1980). Athan concludes that, because he did not use a defense of accident or self-defense, Sumstad's state of mind was not at issue and the exception could not apply. Athan also contends that even if the statements were relevant, they were improper because there was no limiting instruction accompanying them. Athan maintains the admission of the statements constitutes an error that is not harmless.
ś 52 The State argues Athan put Sumstad's state of mind into issue by suggesting the evidence could only prove he had sex with the victim but it could not show *41 assault, rape, or murder.[6] According to the State, Athan's strategy was to argue he and Sumstad had consensual sex at some point before her murder, but that he did not murder her. Additionally, the statements were relevant to Athan's motive. Under the State's theory of the case, Athan sexually assaulted Sumstad and then murdered her for several possible reasons: to prevent her from reporting the assault, because she was struggling during the assault, or because she was making too much noise. Although motive is not an element of murder, it is often necessary when only circumstantial evidence is available. State v. Powell, 126 Wash.2d 244, 260, 893 P.2d 615 (1995). The State contends Athan may not object to the lack of a limiting instruction because he failed to request one during trial. State v. Myers, 133 Wash.2d 26, 36, 941 P.2d 1102 (1997). Finally, the State maintains any error from admitting the statements is harmless. According to the State, substantial evidence existed to suggest the murder occurred during a sexual assault: the victim's body displayed injuries near her vagina and anus; the body was found nude from the waist down; and the victim still had her purse and jewelry, suggesting robbery was not a motive.
ś 53 Out-of-court statements offered to prove the truth of the matter asserted are generally inadmissible as hearsay unless they fall under a recognized exception to the hearsay rule. ER 801, 802. The trial court's decision to admit the evidence is reviewed for abuse of discretion and will not be overturned unless its discretion is manifestly unreasonable or based upon untenable grounds. Powell, 126 Wash.2d at 258, 893 P.2d 615. We cannot say the trial court abused its discretion by allowing the statements under the state of mind exception to the hearsay rule because Athan himself put the victim's state of mind into issue. Athan's trial strategy was to suggest a relationship between himself and the victim and to try to distance the sexual encounter he had with the victim with her subsequent murder. By suggesting a relationship between himself and Sumstad, Athan made Sumstad's statements concerning her feelings toward Athan relevant. The trial court did not abuse its discretion by allowing this hearsay evidence because the defendant made the victim's feelings toward him a relevant issue. Although a limiting instruction on such evidence is generally required, the failure of a court to give a limiting instruction is not error when no instruction was requested. Myers, 133 Wash.2d at 36, 941 P.2d 1102. Because Athan failed to request a limiting instruction during the trial, he is precluded from arguing it was harmful error here.

2. Confrontation Clause
ś 54 Athan argues his Sixth Amendment rights were violated when the nontestimonial statements of the victim were admitted because they did not bear adequate indicia of reliability. Athan's argument hinges on our finding above because reliability of a hearsay statement is presumed if it falls within a recognized exception to the hearsay rule. State v. Whelchel, 115 Wash.2d 708, 715, 801 P.2d 948 (1990). Because we find the statements were properly admitted under the state of mind exception to the hearsay rule, Athan's claim fails. We note Crawford is not implicated here because the statements were nontestimonial. See Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay lawâ as does Roberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether" (emphasis added)).

*42 D. Athan's Brother's Out-of-Court Statements
ś 55 Sometime shortly after the victim's body was discovered, Athan's brother, James Athan (James), told Officer McGee, a Seattle Police Officer, that he saw Athan the evening before the body was discovered in the area pushing a cart with a large box on it. VRP (Jan. 13, 2004) at 126. In a 2003 interview, James clarified his statement by saying he saw Athan several nights before the body was discovered, not the night before. CP at 108. Neither James nor Officer McGee testified at Athan's trial. However, James' statement to Officer McGee was referenced in the testimony of two witnesses. First, Detective Mixsell, in describing the questioning of Athan before he was arrested in New Jersey, testified to asking Athan about James' statement and Athan's response. VRP (Jan. 13, 2004) at 126. Second, Detective Wallock testified that he was asked to interview Athan the day after the body was discovered based on information received from James. VRP (Jan. 13, 2004) at 148-49. Detective Wallock did not testify to the content of the information received from James though he did testify that Athan, during this interview, admitted he had been in the neighborhood on the evening prior to the body being discovered with a cart for the purpose of collecting firewood. VRP (Jan. 13, 2004) at 149. No one directly testified to seeing Athan the night before the body was found pushing a cart with a large box on it.

1. Hearsay
ś 56 Athan argues testimonial hearsay statements against a defendant are not admissible unless the witness is no longer available and the defendant had a prior opportunity to examine the witness. Crawford, 541 U.S. at 59, 124 S.Ct. 1354. Athan contends James' statement was testimonial for several reasons. First, it was reasonable for an objective witness to believe the statement would be available for use at a later trial. Second, it was a pretrial statement that the declarant could reasonably believe would be used prosecutorially. Finally, it was a statement made to a police officer in the course of an investigation. See Crawford, 541 U.S. at 51-52, 124 S.Ct. 1354 (explaining what kind of statements should qualify as "`testimonial'"). Athan concludes that because the statement was testimonial and James was available at trial, the evidence was not admissible. Under Crawford, Athan argues, his Sixth Amendment right to confront any witness against him was violated.
ś 57 The State first argues the statements were not testimonial because they were not made pursuant to a formal interrogation. Rather, James happened to encounter Officer McGee at around 4:00 a.m. and was still emotional from hearing the news of Kristen's death. CP at 268, 270. Second, the State argues that even testimonial evidence may be admitted if it is not being used to prove the truth of the matter asserted. Crawford, 541 U.S. at 60 n. 9, 124 S.Ct. 1354. The State contends Detective Wollack did not testify as to the contents of James' statements and was merely explaining why he questioned Athan at that time. Testimony that does not disclose the contents of the hearsay and is used to provide background does not violate the Sixth Amendment. See United States v. Cromer, 389 F.3d 662, 675-76 (6th Cir.2004). The State contends Detective Mixsell's testimony also did not violate the Sixth Amendment because, although he disclosed the contents of James' statement, he did so to provide context to Athan's answer to the question. Athan's answer would be admissible under ER 801(d)(2) and without the context of James' statements, Athan's response would not make sense. Statements not used to prove the truth of the matter asserted, but instead used to provide context to a defendant's otherwise admissible statement do not violate the Sixth Amendment. See State v. Smith, 162 Ohio App.3d 208, 832 N.E.2d 1286, 1291 (2005).
ś 58 Because our analysis here does not turn on whether the statement is testimonial, we assume without deciding that it is. Detective Wollack testified he was asked to question Athan the day after the body was discovered based on information the police had received from James. VRP (Jan. 13, 2004) at 148. Wollack also confirmed he asked Athan if he had been in the area of the television store the night before the body *43 was discovered. VRP (Jan. 13, 2004) at 149. Wollack testified Athan said he had been in the area collecting firewood. VRP (Jan. 13, 2004) at 149. We find no violation of Athan's Sixth Amendment rights during this exchange. The content of James' statement was not revealed to the jury during this exchange so arguably, the testimony does not even qualify as hearsay. The reference to James' statement was made in passing as an explanation of why Detective Wollack was questioning Athan. See Cromer, 389 F.3d at 675-76. We agree with the Cromer court's holding that testimony which does not disclose the content of hearsay and is referenced only to provide context or background to the testimony is not a Crawford violation.
ś 59 Unlike Detective Wollack, Detective Mixsell was revealing the content of James' statement to the jury. In a narrative answer, Mixsell testified to the following:
I told him thatâ I'm sorry, I told John Athan his brother saw him with a large box on a grocery cart, that his brother had told detectives he saw him with the cart and box the night before. John Athan said: That's ridiculous, and no way, never.
VRP (Jan. 13, 2004) at 126. In this context, the statement comes closer to being used to prove the truth of the matter asserted and, therefore, improper. The State gives two alternative reasons for the statement: to give context to the defendant's response and to show how the defendant's story changed from 1982 to this interview in 2003. The fact that the statement may serve more than one purpose does not negate its use to prove the truth of the matter asserted. However, at most, the effect of the statement is to place Athan in the area where the body was found, with a cart and a box, something Athan admitted to. Athan's initial statements to the police in 1982 are entirely consistent with this testimony. The testimony, in context, does not go to prove any material fact in dispute. Under these circumstances, Crawford is not implicated.

CONCLUSION
ś 60 We find the DNA evidence admissible under both the state and federal constitutions. No recognized privacy interest exists in voluntarily discarded saliva and a legitimate government purpose in collecting a suspect's discarded DNA exists for identification purposes. Although the ruse used by detectives in this case violated certain statutes, it was not so outrageous or shocking as to warrant dismissing the case under CrR 8.3(b). We find the evidence presented by the State was sufficient to prove Athan was guilty beyond a reasonable doubt of second degree murder. Athan's motion to dismiss for insufficiency was properly denied. We find Athan made a valid waiver of his Miranda rights when he voluntarily spoke with police and later invoked his rights to end the questioning. We hold it was not error to allow statements made by the decedent into evidence when Athan put the decedent's feelings toward him in issue by suggesting they engaged in consensual sex and the statements fell under the state of mind exception to the hearsay rule. Finally, assuming the statement made by James to Officer McGee was testimonial hearsay, the testimony of Detective Wollack did not reveal the content of James' statement and Detective Mixsell's testimony regarding James' statement does not implicate Crawford because the statement was consistent with Athan's own admissions. The conviction of the appellant is affirmed.
WE CONCUR: SUSAN OWENS, BARBARA A. MADSEN, JAMES M. JOHNSON, BOBBE J. BRIDGE, JJ.
ALEXANDER, C.J., concurring.
ś 61 I concur in the result reached by the majority. Like the majority, I conclude that there is no basis upon which to overturn John Athan's conviction for second degree murder of 13-year-old Kristen Sumstad. I write separately only to make my views known on various aspects of this novel case.
ś 62 First, I believe that an individual has, under the Washington State Constitution, a greater expectation of privacy in his DNA (deoxyribonucleic acid) than the lesser privacy interest accorded to his mere identity. Accord Robinson v. City of Seattle, 102 Wash.App. 795, 819, 10 P.3d 452 (2000) (preexisting state law reflects a consistent *44 protection of privacy of the body and bodily functions; collection and testing of urine sample triggered article I, section 7 protections). A person's DNA, whether it be contained, for example, in his saliva, in a droplet of blood, or in a strand of hair, is not, as the majority suggests, equivalent to a person's thumbprint or the cadence of his voiceâ physical characteristics that truly speak to our identity only. Rather, a person's DNA goes beyond who we are to what we are. Accord Br. of Amicus Curiae [American Civil Liberties Union] ACLU at 11-14.
ś 63 The majority's position is made even more untenable when one considers our decision in State v. Boland, 115 Wash.2d 571, 800 P.2d 1112 (1990). In that case, we held that a person has a reasonable expectation of privacy in items placed in a trash can outside his home. It is hard for me to imagine that a person has a reasonable expectation of privacy in his garbage, but he does not have the same reasonable expectation of privacy in his body makeup. Consequently, I would hold that a person's privacy interest in his DNA is one that Washington citizens "`should be entitled to hold, safe from governmental trespass.'" State v. Ladson, 138 Wash.2d 343, 979 P.2d 833 (1999) (quoting State v. Myrick, 102 Wash.2d 506, 511, 688 P.2d 151 (1984)).
ś 64 However, as discussed numerous times by this and other Washington courts, article I, section 7 protections are not triggered unless the State has unreasonably intruded on a person's private affairs. See Boland, 115 Wash.2d at 580, 800 P.2d 1112. A defendant bears the burden of proving that the State has disturbed his private affairs. State v. Young, 135 Wash.2d 498, 510, 957 P.2d 681 (1998). I agree with the majority that Athan has failed to satisfy this burden. I say this because, like the majority, I believe Athan voluntarily relinquished his privacy interest. As we indicated in State v. Carter, 151 Wash.2d 118, 85 P.3d 887 (2004), a person no longer has a privacy interest in something he voluntarily exposes to the public. Id. at 126-27, 85 P.3d 887 (defendant did not have a privacy interest in either the exterior or interior of a gun when he voluntarily exposed the gun to the public and encouraged and invited the public to observe, handle, and explore it). Here, without force or compulsion, Athan knowingly exposed his saliva, and the DNA contained therein, by licking the envelope, by putting that envelope into the public mail system, by sending it to persons unknown to him, and by implicitly inviting the recipients to open the envelope. In my view, these actions can be construed as a waiver of Athan's heightened right to privacy under the state constitution in whatever DNA adhered to the letter.[1] Consequently, I conclude that detectives involved here did not intrude upon Athan's private affairs and, therefore, did not need "authority of law" to collect and test Athan's saliva/DNA.
ś 65 I also concur in that portion of the majority opinion that concludes that the police activity of unlawfully engaging in the practice of law in violation of RCW 2.48.180[2] *45 neither calls for excluding the DNA evidence in this case nor constitutes the level of governmental misconduct warranting dismissal under CrR 8.3(b). As all parties to this case agree, public policy permits law enforcement to engage in a limited amount of unlawful activity in order to detect and investigate crime. Accord State v. Emerson, 10 Wash. App. 235, 242, 517 P.2d 245 (1973) (police may permissibly engage in "`a limited participation' in [] unlawful . . . practices" (quoting United States v. Russell, 411 U.S. 423, 432, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973))). Therefore, like the majority, I conclude that the trial court did not manifestly abuse its discretion or base its decision on untenable grounds in denying Athan's motion to dismiss the charges against him pursuant to CrR 8.3 when it determined that this case was not comparable to those cases in which law enforcement officers posed as attorneys in order to obtain confidential or privileged information. Accord State v. Michielli, 132 Wash.2d 229, 239-40, 937 P.2d 587 (1997) (Before a court can dismiss a criminal charge under CrR 8.3(b), a defendant must show arbitrary action or governmental misconduct that prejudiced his right to a fair trial.).
ś 66 Dismissal under CrR 8.3(b) is an "`extraordinary remedy'" that should be granted sparingly. Michielli, 132 Wash.2d at 246, 937 P.2d 587 (Alexander, J., dissenting) ("dismissal of charges under CrR 8.3(b) is an extraordinary remedy available only when the accused's right to a fair trial has been materially affected" (citing State v. Blackwell, 120 Wash.2d 822, 830, 845 P.2d 1017 (1993))). Reasonable minds may differ regarding the trial court's and the majority's conclusion that the ruse employed here was not repugnant to a "sense of justice." Majority at 38. However, in my view, the extraordinary remedy of dismissal is not called for in this case because the trial court's reasoning for denying the motion was not manifestly unreasonable or untenable. That court relied on a long line of Washington cases allowing police to engage in some amount of illegal activity to detect and investigate crimes, and there was no showing of game playing or mismanagement on the part of the State at trial that prejudiced Athan's defense.
ś 67 Setting the CrR 8.3(b) challenge aside, I would be inclined to concur in Justice Chambers's dissenting opinion if I believed that the actions of the detectives in this case undermined principles backstopping the attorney-client relationship. As Justice Chambers articulates, sound policy and constitutional reasons exist for according strong protections to attorney-client communications. But, in my view, those reasons are not implicated here.
ś 68 This police ruse was not directed at obtaining confidential or privileged information, and it did not interfere with an established attorney-client relationship. In addition, the detectives did not pose as defense attorneys, their actions were not designed to induce Athan to commit a crime, and they did not intrude upon a privileged communication or conversation as evidenced by the fact that Athan objected at trial to only the DNA obtained from the envelope and not the purported class action lawsuit letter contained therein. Accord RCW 5.60.060(2)(a) (attorney-client privilege protects confidential communications between attorneys and clients); Bohn v. Cody, 119 Wash.2d 357, 363, 832 P.2d 71 (1992) ("essence of the attorney/client relationship is whether the attorney's advice or assistance is sought and received on legal matters"); State v. Garza, 99 Wash.App. 291, 296, 994 P.2d 868 (2000) (seizing and reading inmates' legal documents and materials that contained private communications with their defense attorneys impermissibly intruded upon attorney-client *46 relationship). I strongly agree with the dissent that posing as a fake law firm was not the best choice of means for collecting Athan's DNA. And, as the State acknowledges, this ruse "walked perilously close to the line of permissible police ruses." Br. of Resp't at 35. Even so, in my view, the fact that the detectives here engaged in the unauthorized practice of law does not, without an additional showing that the State sought to obtain Athan's confidential or privileged communications with his attorney, call for suppression of that evidence.
ś 69 Lastly, I disagree with the majority's conclusion that the trial court did not err in admitting Detective Mixsell's testimony that related statements Athan's brother James allegedly made to detectives about Athan's actions around the time of the murder. Under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), testimonial hearsay[3] statements are admissible only where the declarant is subject to full and effective cross-examination and the declarant is unavailable at trial. Id. at 54, 124 S.Ct. 1354. Here, Athan's brother James did not testify at trial, and the record indicates that he had not previously been cross-examined. Therefore, the only question remaining is whether James Athan's statements were "testimonial."
ś 70 As the United States Supreme Court made clear, statements taken by police officers in the course of police interrogations are "testimonial." Id. at 52, 124 S.Ct. 1354. Although James Athan's statement was not made in the course of a formal police interrogation, the United States Supreme Court made known in Crawford that the term "interrogation" could be defined in its colloquial, as opposed to its technical, sense, e.g., questions posed to those in police custody after having been given a Miranda warning.[4]Id. at 53 n. 4, 124 S.Ct. 1354. In my view, questions posed by law enforcement to a potential witness while investigating a completed crime and a suspect's involvement therein and that are designed to gather evidence for use in a criminal prosecution meet the Supreme Court's expansive definition of "interrogation." Accord People v. West, 355 Ill.App.3d 28, 823 N.E.2d 82, 87-90, 291 Ill. Dec. 72 (2005). Therefore, statements made by witnesses to those questions are "testimonial" in nature when the circumstances objectively indicate the primary purpose of those interrogation questions was to establish or prove past events potentially relevant to identifying or convicting the perpetrator. Davis v. Washington, ___ U.S. ___, 126 S.Ct. 2266, 2273-74, 165 L.Ed.2d 224 (2006).
ś 71 Applying the United States Supreme Court's formulation of "testimonial" here, at the time James Athan was questioned by Officer McGee, more than 10 hours had passed since the discovery of Kristen Sumstad's body. The questioning was not, therefore, conducted in the course of "an ongoing emergency." Davis, 126 S.Ct. at 2273. The questioning was conducted for the purposes of establishing the events of the murder and gathering evidence in order to identify the perpetrator of the crime. In turn, Officer McGee was provided with detailed descriptions of Athan's possible involvement in the crime and events that transpired around the time of the crime's commission. The investigative questions produced a statement which, if used to convict Athan, "would implicate the central concerns underlying the confrontation clause." West, 291 Ill.Dec. 72, 823 N.E.2d at 88 (citing Crawford, 541 U.S. at 52-53, 124 S.Ct. 1354). Accordingly, I would conclude that the statement James Athan gave to Officer McGee in 1982 regarding the defendant in this case, which was repeated by Detective Mixsell at trial, is testimonial in nature. Therefore, because James Athan was unavailable to testify at trial and the defendant in this case did not have an opportunity to cross-examine him, I would hold, contrary to the majority's conclusion, that James Athan's statement was not admissible.
ś 72 Although I believe that the trial court erred in admitting this testimony, any error was undoubtedly harmless beyond a reasonable doubt. I say this because there is DNA *47 evidence linking Athan directly to the crime scene and to semen found in and on the victim. Furthermore, Athan admitted that he was in the immediate area where Sumstad's body was found the night before it was found and admitted to using a handcart or the like at that time. Athan also concealed his associations with Sumstad from police investigating the crime. And, finally, testimony establishes that Athan personally knew Sumstad and appeared to be interested in her sexually. In light of this evidence, the outcome of Athan's trial would not have been different had this hearsay been excluded.
ś 73 In sum, I disagree with the majority's conclusions that one's DNA is afforded no greater privacy interest protection than one's identity and that the trial court properly admitted Detective Mixsell's testimony as to hearsay. However, because I conclude the detectives involved in this case did not disturb Athan's private affairs and that the trial court's error was harmless, I concur with the majority in affirming Athan's conviction.
CHAMBERS, J. dissenting.
ś 74 I fully concur with Justice Fairhurst's dissent. I write separately to address the consequences of allowing police officers to collect evidence by impersonating lawyers. I strongly disagree with the majority's conclusion such evidence is admissible.
ś 75 Creative and inventive police work should be encouraged. But the police must work within the rule of law. I can say it no better than Justice Thurgood Marshall:
[G]ood police work is something far different from catching the criminal at any price. It is equally important that the police, as guardians of the law, fulfill their responsibility to obey its commands scrupulously. For "in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves."
Brewer v. Williams, 430 U.S. 387, 407, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (Marshall, J., concurring) (quoting Spano v. New York, 360 U.S. 315, 320-321, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959)). Justice Marshall was right. As judges, it is our sworn duty to preserve the integrity of that rule of law. Allowing the police to impersonate attorneys in order to trick a man into incriminating himself undermines the rule of law in a particularly pernicious way, and courts should not be shy about saying so.
ś 76 This is not a new principle. Well over a hundred years ago, the Michigan Supreme Court considered the admissibility of a "confession" made by a defendant to a detective posing as an attorney. It ruled that "[c]onfidential communications made in reliance upon the supposed relation of attorney and client, whether the party assuming to act as such is an attorney or not, are excluded upon the plainest principles of justice." People v. Barker, 60 Mich. 277, 297, 27 N.W. 539 (1886); accord State v. Russell, 83 Wis. 330, 338, 53 N.W. 441 (1892) ("The rule is invariable that confidential communications made to one falsely pretending to be the counsel of the accused are privileged.").
ś 77 This is because the right to representation is the foundation upon which our system of justice is built. The attorney/client privilege is the cornerstone of that foundation. The privilege protects both the client's communications and physical objects. State ex rel. Sowers v. Olwell, 64 Wash.2d 828, 831, 394 P.2d 681 (1964). Further, Washington law provides privacy protection for attorney/client communications. RCW 5.60.060(2)(a). While attorneys may, under some circumstances, be required to turn over objects given to them by their clients, it must be done consonant with our ethical rules. Olwell, 64 Wash.2d at 834-35, 394 P.2d 681. What happened here was not consonant with those rules. The proper administration of justice requires stringent protection of full and frank communications between attorneys and their clients.
ś 78 Here the police created a fictitious law firm, posed as attorneys, and specifically solicited John Athan to be their client. This is serious business. It implicates the Sixth Amendment right to counsel. Washington law prohibits a nonattorney from holding himself or herself out as an attorney. RCW 2.48.180(2)(a). The first violation is a misdemeanor, the second a felony. RCW 2.48.180.
*48 ś 79 As Justice Brandeis warned us long ago, "[c]rime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy." Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). This court, at the very least, should honor the notion that we are a nation under laws by not opening the court room doors to the fruit of such conduct.
ś 80 While posing illegally as lawyers in a law firm, the police invited Athan to communicate with them as a client. Athan responded to the supposed law firm's solicitation by signing an authorization form allowing the law firm to represent him in a class action. Athan sent it to what he reasonably believed was a law firm representing his interest. The trial court quite properly found that the police engaged in the unauthorized practice of law. We are given to understand that no charges are contemplated. Wash. State Supreme Court oral argument recording, State v. Athan, No. 75312-1 (Jan. 26, 2006), at approx. 40 min., 50 sec.
ś 81 Police intrusion into the attorney/client privilege is improper and should not be condoned by any court of law, no matter who the "client" is. Our traditions have recognized for a very long time that being a "`bad man is not a sufficient excuse; for the guilty are almost always the first to suffer those hardships which are afterwards used as precedents against the innocent.'" Moran v. Burbine, 475 U.S. 412, 437, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (Stevens, J., dissenting) (quoting 1 Thomas babington Macaulay, The History of England 482 (1849) (1968 ed.)). Permitting this unlawful and unethical conduct of the police undermines the right of representationâ the ability of all people to communicate freely with their attorneys without fear that the communications will be used against them.
ś 82 Attorneys are bound by the rules of professional conduct and the ethical rules that undergird them. The police, masquerading as lawyers, engaged in the unauthorized practice of law. I believe those who pretend to be lawyers should be bound by lawyers' ethical rules. Cf. Jones v. Allstate Ins. Co., 146 Wash.2d 291, 305, 45 P.3d 1068 (2002) (nonlawyers practicing law are held to the same duties of care as lawyers).
ś 83 This court should discourage the police from impersonating officers of the court. The city of Seattle expressly prohibits the commingling of law enforcement duties and other professional responsibilities. Seattle City Charter art. VI, § 5. Yet newly armed with colorable authority of law, Seattle's police officers (and those of any other jurisdiction) may now pose as attorneys without the encumbrance of even the most basic professional responsibilities, indeed without any criminal culpability.
ś 84 Permitting police to impersonate attorneys undermines the necessary trust between attorney and client. Clients will be discouraged from speaking freely with their attorneys. But "[t]he Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." Strickland v. Washington, 466 U.S. 668, 685, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). If attorneys cannot be trusted, their role cannot be fulfilled and our whole system of justice is undermined. "Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." Mapp v. Ohio, 367 U.S. 643, 659, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).
ś 85 As reluctant as I am to risk letting a murderer free, such is the price of a free society.[1] Because the communication was *49 privileged, I would suppress the evidence as the fruit of that communication. Accordingly, I respectfully dissent.
WE CONCUR: RICHARD B. SANDERS, J.
FAIRHURST, J. dissenting.
ś 86 The majority errs in claiming that John Nicholas Athan's privacy interest is merely his identity. It is not. Athan's privacy interests are his bodily integrity and his genetic information. By mischaracterizing the privacy interest as one of identity, the majority misapplies this court's established analysis of article I, section 7 of the Washington Constitution to the facts of this case.
ś 87 The majority's application of article I, section 7's protection of Athan's saliva and DNA (deoxyribonucleic acid) is breathtaking in its sweep and impossible to reconcile with other rulings of this court. Under the majority's holding, the government could analyze the DNA in anyone's saliva, however obtained, as long as it was not directly from the person's mouth, and use the information to construct a DNA database that includes both felons and nonfelons. Because DNA contains the most intimate details about a person, I cannot agree with either the majority's reasoning or holding.
ś 88 Additionally, the majority errs in concluding that Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), was not implicated when the court admitted Athan's brother, James Athan's, out-of-court statement. James' statement was testimonial, James did not testify about his statement at trial, and Athan did not have an opportunity to cross-examine James.
ś 89 For these reasons, I dissent.

ANALYSIS
A. Privacy interests in saliva and DNA
ś 90 In analyzing Athan's privacy interests, the majority makes two fundamental errors. First, it mischaracterizes the protections afforded under article I, section 7. Second, it misapplies this court's established article I, section 7 analysis to the facts of this case.
1. Characterization of article I, section 7 protections
ś 91 We have held that it is no longer necessary to analyze the factors set out in State v. Gunwall, 106 Wash.2d 54, 64, 720 P.2d 808 (1986), to determine whether it is appropriate to conduct an independent state constitutional analysis under article I, section 7 with regard to search and seizure questions. State v. Jackson, 150 Wash.2d 251, 259, 76 P.3d 217 (2003). Therefore, I agree with the majority that it is appropriate for us to analyze this case under article I, section 7. However, I disagree with its conclusion that article I, section 7 does not provide greater protection in the context of this case.
ś 92 We have explicitly recognized that article I, section 7 of the Washington Constitution[1] is more protective than the fourth amendment to the United States Constitution.[2]Jackson, 150 Wash.2d at 259, 76 P.3d 217. This court's article I, section 7 inquiry is at once more extensive and affords greater protection of privacy than the Fourth Amendment. State v. Cheatam, 150 Wash.2d 626, 642, 81 P.3d 830 (2003). Rather than applying the Fourth Amendment's emphasis on citizens' "`subjective privacy expectations . . . due to well publicized advances in surveillance technology,'" article I, section 7 protection emphasizes an individual's objective expectation of privacy. State v. Young, 123 Wash.2d 173, 181, 867 P.2d 593 (1994) (quoting State v. Myrick, 102 Wash.2d 506, *50 511, 688 P.2d 151 (1984)). Because article I, section 7 protects objective expectations of privacy, this court applies a "more expansive interpretation to article I, section 7" than to the Fourth Amendment. Gunwall, 106 Wash.2d at 65, 720 P.2d 808 (emphasis added).
ś 93 In other words, whereas Fourth Amendment protection "`operates on a downward ratcheting mechanism of diminishing expectations of privacy, article I, section 7, holds the line by pegging the constitutional standard to "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant."'" Robinson v. City of Seattle, 102 Wash.App. 795, 819, 10 P.3d 452 (2000) (quoting State v. Ladson, 138 Wash.2d 343, 349, 979 P.2d 833 (1999) (quoting Myrick, 102 Wash.2d at 511, 688 P.2d 151)). In effect, the enhanced protections provided by article I, section 7 create a relationship between article I, section 7 and the Fourth Amendment in which article I, section 7 builds upon Fourth Amendment protections in many contexts.
ś 94 The majority demonstrates its understanding of the relationship between article I, section 7 and the Fourth Amendment by acknowledging that the federal constitution provides a minimum level of protection against intrusions into an individual's private affairs. However, it misrepresents that relationship by limiting its article I, section 7 analysis to Athan's saliva while giving no consideration to his DNA. Majority at 33.
ś 95 As I demonstrate below, we must focus our inquiry under article I, section 7 on Athan's privacy interests in both his saliva and his DNA and on the protection provided to those interests.[3]
2. Application of article I, section 7 analysis to Athan's privacy interests in his saliva and DNA
ś 96 An analysis of Athan's privacy interests in his saliva and DNA must begin with a determination of whether those interests have historically been protected under article I, section 7. State v. McKinney, 148 Wash.2d 20, 27, 60 P.3d 46 (2002). The determination of whether an interest has been historically protected requires "`an examination of whether the expectation [of privacy] is one which a citizen of this state should be entitled to hold.'" Id. at 29, 60 P.3d 46 (quoting City of Seattle v. McCready, 123 Wash.2d 260, 270, 868 P.2d 134 (1994)).
ś 97 In addition to considering whether historical precedent favors protection under article I, section 7, we must consider the "nature and extent of the information" the government may learn about the person's "contacts and associations" or intimate details of the person's life. McKinney, 148 Wash.2d at 29-30, 60 P.3d 46.
ś 98 Finally, in analyzing the "nature and extent of the information" the government may learn about the person, we must consider whether the person voluntarily exposed the information to the public. McKinney, 148 Wash.2d at 29, 60 P.3d 46.
ś 99 When we apply the analysis outlined above, the only possible conclusion is that the detectives invaded Athan's privacy interests in his saliva and DNA without authority of law when they enticed him to leave his saliva on an envelope and analyzed the DNA in his saliva.

Historical protection afforded to saliva and DNA
ś 100 There is no question that the privacy interest in the body and bodily functions has historically been afforded protection under article I, section 7 in a variety of contexts and is one that citizens should be entitled to hold. State v. Meacham, 93 Wash.2d 735, 738, 612 P.2d 795 (1980) (compelled testing of DNA to determine paternity); Robinson, 102 Wash.App. at 822, 10 P.3d 452 (compelled blood testing as a requirement for government employment). We recognize privacy interests in the body and bodily functions even when some circumstance arises that *51 consequently diminishes those interests. State v. Farmer, 116 Wash.2d 414, 429, 805 P.2d 200, 812 P.2d 858 (1991) (recognizing a privacy interest in opposing blood tests under the less protective Fourth Amendment but holding that the interest diminishes when a person is convicted of a crime).
ś 101 The majority's conclusion that Athan has no privacy interest in his saliva, and its complete indifference to his privacy interest in his DNA, are indefensible in light of this court's long history acknowledging privacy interests in the body and bodily functions. See majority at 33. Further, Athan's interests were undiminished at the time the detectives obtained his saliva and DNA because he had not been convicted of a crime.
ś 102 Because we recognize privacy interests in the body and bodily functions and because Athan's privacy interests in his saliva and DNA were undiminished because he had not been convicted of a crime, I would conclude that the detectives invaded Athan's privacy interests in his saliva and DNA.

Nature and extent of information the government could learn
ś 103 Even if we were to conclude that saliva and DNA have not been historically protected under article I, section 7, we must consider the extent to which persons' movements, associations, lifestyle, and other intimate details of their lives would be revealed. McKinney, 148 Wash.2d at 29, 60 P.3d 46.
ś 104 Prior opinions of this court have held that law enforcement may not (1) use a global positioning system (GPS) device to follow a person's movements in a vehicle, (2) use an infrared heat device to view a person's activities inside a home, (3) search the contents of garbage a person left out on the street for pick up, or (4) obtain a pen register to detect telephone numbers a person called. Jackson, 150 Wash.2d at 262, 76 P.3d 217 (GPS device); Young, 123 Wash.2d at 181-82, 867 P.2d 593 (infrared device); State v. Boland, 115 Wash.2d 571, 578, 800 P.2d 1112 (1990) (garbage); Gunwall, 106 Wash.2d at 67-68, 720 P.2d 808 (pen register). Yet, the majority now concludes that law enforcement officers may extract a person's DNA, which contains highly sensitive information about a person's health and intimate associations, from a sample of saliva left on an envelope. The majority can reach such an absurd conclusion only by limiting its analysis to Athan's saliva and ignoring the vast amount of information available in his DNA.
ś 105 The majority's argument that the detectives sought Athan's DNA only for identification purposes, while artful, is incorrect. Athan's identity was never in question. The detectives needed his DNA so they could match it to DNA extracted from semen found on Kristen I. Sumstad's body. But even if Athan's identity were the only matter at issue, unlike the statutes limiting the use of DNA collected when a person has been convicted of a crime, see State v. Surge, ___ Wash. ___, 156 P.3d 208, 214 (2007) and RCW 43.43.754(2), no statute limits the government's use of Athan's DNA to verifying his identity. Thus, the government is not constrained from using Athan's DNA in whatever way it deems appropriate.
ś 106 Because Athan's DNA provided the government with vast amounts of intimate information beyond mere identity, I would conclude that Athan has privacy interests in his saliva and DNA.

Voluntary
ś 107 Next, we must analyze whether Athan's actions were voluntary. McKinney, 148 Wash.2d at 29, 60 P.3d 46.
ś 108 Actions are "voluntary" if they are "done by design or intention: not accidental: intentional," or the person is "acting of oneself: not constrained, impelled, or influenced by another: spontaneous, free." Webster's Third New International Dictionary 2564 (2002). It is apparent from this definition that mere absence of force is not sufficient to show that Athan's actions were voluntary. Actions can be involuntary simply because they are the direct result of outside influence.
ś 109 Here, the fact that the detectives posed as attorneys to obtain the saliva and DNA caused Athan's actions to be involuntary. Although the detectives did not force Athan to provide a saliva sample, their actions *52 were akin to those of law enforcement officers in Ferguson v. City of Charleston, 532 U.S. 67, 84, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001), in which the officers obtained consensually extracted bodily fluids of pregnant patients suspected of drug abuse from hospital staff without the patients' knowledge. The United States Supreme Court explicitly rejected the practice and concluded the patients did not provide the body fluids voluntarily, reasoning that patients would not expect hospital staff to provide incriminating evidence against them even if the staff were required by law to report incriminating conduct. Id. at 78 n. 13, 121 S.Ct. 1281. Similarly, Athan would not expect someone he believed to be an attorney to obtain incriminating evidence against him by extracting the saliva from the envelope he sent to the attorney.
ś 110 Athan's actions were also not voluntary because the detectives used specialized technology to "see" his DNA. In Young, we held that the defendant did not voluntarily expose his activities when law enforcement used a device that went "well beyond an enhancement of natural senses . . . [and] enabled the officers to conduct their surveillance without Mr. Young's knowledge." Young, 123 Wash.2d at 183, 867 P.2d 593. "The infrared device thus represent[ed] a particularly intrusive means of observation that exceeds our established surveillance limits." Id. Just as in Young, the testing of Athan's saliva went beyond enhancement of natural senses and allowed law enforcement to observe Athan's DNA without his knowledge. Just as Young did not consent to the infrared surveillance, Athan did not consent to the extraction and sequencing of his DNA.
ś 111 Because Athan did not voluntarily provide his saliva and DNA to the detectives, I would conclude that he retained his privacy interests in his saliva and DNA when he licked an envelope and mailed it to the detectives.

Exposed to the public
ś 112 Lastly, we must determine if Athan's saliva and DNA were exposed to the public. McKinney, 148 Wash.2d at 29, 60 P.3d 46.
ś 113 People expose to the public their physical description, personal characteristics, soles of shoes, and sound of voice. McKinney, 148 Wash.2d at 27-29, 60 P.3d 46 (physical description on Department of Licensing records); State v. Selvidge, 30 Wash.App. 406, 411, 635 P.2d 736 (1981) (tread pattern on soles of shoes); United States v. Dionisio, 410 U.S. 1, 5-6, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (sound of voice). However, these types of outward physical attributes are not analogous to either saliva or DNA. Saliva does not possess the same descriptive qualities as a person's physical description, tread pattern on shoes, or a person's voice. It is merely the material from which such information is obtained.
ś 114 While DNA is comparable in some ways to other physical characteristics because it provides information regarding identity, it reveals far more information than a person's voice or fingerprints. See, e.g., James F. Van Orden, Recent Development, DNA Databases and Discarded Private Information?: "Your License, Registration and Intimate Bodily Details, Please," 6 N.C.J.L. & Tech. 343, 352 (2005). A person's voice does not contain the kind of intimate details about a person that DNA contains. Id. Similarly, fingerprints are distinguishable from DNA because "[l]ike DNA, a fingerprint identifies a person, but unlike DNA, a fingerprint says nothing about the person's health, their propensity for particular disease, race and gender characteristics, and perhaps even propensity for certain conduct." United States v. Kincade, 379 F.3d 813, 842 n. 3 (2004) (Gould, J., concurring).
ś 115 In stark contrast to saliva, fingerprints, and other physical characteristics, one never exposes one's DNA to the public. Van Orden, 6 N.C.J.L. & Tech. at 352. "The highly personal information that is revealed after analysis of one's DNA is never exposed to the public without the aid of modern technological tools." Id. We do not expose DNA to the public merely by virtue of the fact that it is contained in other material, such as blood, hair, skin, or saliva. We do not expose DNA to the public when it can be "seen" only with specialized equipment.
*53 ś 116 Because Athan's saliva and DNA were not exposed to the public, I would conclude that Athan retained his privacy interests in his saliva and DNA when he licked an envelope and mailed it to the detectives.
ś 117 In sum, because the government intruded on Athan's privacy interests in his saliva and DNA without authority of law,[4] the DNA evidence should be inadmissible and the case should be remanded for a new trial without it or the conviction should be vacated.
B. Crawford violation
ś 118 I also disagree with the majority's conclusion that Detective Gregg Mixsell's testimony about a statement made by James did not violate Crawford. The majority makes two errors in its analysis. First, it declines to address the straightforward question of whether James' statement was testimonial. Second, it erroneously concludes that James' statement did not violate Crawford because it was not offered to prove the truth of the statement.
ś 119 With regard to whether James' statement was testimonial, the majority assumes that James' statement was testimonial for the purposes of its analysis when it need not sidestep such an obvious conclusion. A person in James' position would undoubtedly be aware that his statement could be used to prosecute his brother. In fact, James demonstrated his awareness that the statement might be used for this purpose by subsequently altering it. I would hold that James' statement was testimonial.
ś 120 As to the question of whether James' testimonial statement violated Crawford, it is clear that James' statement was offered to prove the truth of what he asserted. Mixsell provided explicit details about James' statement and the fact that James was the source of the information. Mixsell testified that he told Athan "his brother saw him with a large box on a grocery cart, that [James] had told detectives he saw him with the cart and box the night before." Verbatim Report of Proceedings (VRP) (Jan. 13, 2004) at 126. Even the majority acknowledges that Mixsell's testimony revealed the content of James' statement. Majority at 42. However, it then proceeds to accept with little analysis the State's arguments about the intended purpose for introducing the statement.
ś 121 The State argued that it offered James' statement in part to provide "context" for Athan's denial of James' claim. However, Athan denied only that he had a cardboard box on a grocery cart. He did not deny that he was in the area the night before the police found Sumstad's body. He did not deny that he had a luggage cart loaded with firewood. Therefore, Mixsell's testimony effectively brought into evidence James' out-of-court statement about the cardboard box without giving Athan an opportunity to impeach James on that question in court.
ś 122 The State also argued that it used Mixsell's testimony to show how the defendant's story had changed since 1982. However, Athan's story did not change. He admitted in 1982 that he was near the crime scene collecting firewood the night before police discovered Sumstad's body. When detectives questioned him in 2002, he again admitted that he was near the crime scene the night before police discovered Sumstad's body, and again claimed he was stealing firewood. The only thing he added to his story was that he was carrying the wood on a "little metal cart like you carry a briefcase or a suitcase." VRP (Jan. 13, 2004) at 126. Thus, Athan's story in 1982 was consistent with his story in 2002. Athan's story did not agree, however, with James' statement regarding the cardboard box and the grocery *54 cart. Thus, the effect of Mixsell's testimony was to introduce an inconsistent out-of-court statement without providing Athan an opportunity to impeach James.
ś 123 Chief Justice Alexander argues that although the trial court's admission of James' statement implicated Crawford, the error was harmless because, based on other evidence presented at trial, the outcome of the trial would not have been different had it been excluded. Concurrence at 46. He cites DNA evidence found at the scene, Athan's admission that he was in the area where Sumstad's body was found the night before, and testimony that Athan knew and was sexually interested in Sumstad to support his argument that there was sufficient other evidence to convict Athan without James' statement. Id. However, the DNA evidence found at the crime scene was meaningless without the DNA the detectives unlawfully obtained from Athan. Athan's admission that he was in the area where police found Sumstad's body the night before demonstrated nothing in the absence of DNA connecting him to the crime scene. Athan's admission that he knew and was sexually interested in Sumstad demonstrated only that he may have had sex with her, not that he killed her. Because James' statement appeared to validate evidence that was otherwise of little value without the unlawfully obtained DNA, we cannot conclude beyond a reasonable doubt that the outcome of the trial would not have been different had it been excluded.
ś 124 I would hold that the trial court's admission of Mixsell's testimony about James' statement implicated Crawford. James did not testify at trial, and Athan did not have the opportunity to cross-examine him. Additionally, the State introduced James' statement to prove the truth of the matter assertedâ that James saw Athan with a cardboard box on a grocery cart near the area where police later found Sumstad's body in a box. I would further hold that the admission of James' statement was not harmless error.

CONCLUSION
ś 125 I would hold that the DNA evidence in this case is inadmissible and reverse. The detectives intruded on Athan's expectation of privacy without authority of law when they collected his saliva from an envelope based on a ruse and tested his DNA. Athan did not voluntarily relinquish his privacy interests in either his saliva or his DNA by licking the envelope and placing it in the mail.
ś 126 I would also hold that the admission of Detective Mixsell's testimony about James' statement implicated Crawford. James did not testify at trial, and Athan did not have the opportunity to cross-examine him. Moreover, the State sought to have the statement admitted to prove the truth of James' statement, which was that James saw Athan with a cardboard box on a grocery cart near the area where police found Sumstad's body in a box. I would further hold that the admission of James' statement was not harmless error.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986) (setting forth the factors for evaluating whether an issue merits independent state constitutional interpretation).
[3] We have said while the structural differences in federal and state constitutions means the federal analysis is not binding upon our state constitutional analysis, it can still guide us because both recognize similar constitutional principles; the structural differences in state and federal constitutions may require a different analytical approach. That does not mean, however, that our result will always be inconsistent with the United States Supreme Court. State ex rel. Gallwey v. Grimm, 146 Wash.2d 445, 482, 48 P.3d 274 (2002).
[4] The American Civil Liberties Union is joined by the Washington Association of Criminal Defense Lawyers, the National Association of Criminal Defense Lawyers, and the Washington State Bar Association (WSBA) as amicus curiae. Athan expressly adopted the arguments of the amici in his reply brief.
[5] Athan does not specify in his brief if he is appealing the trial court's denial of his pretrial Knapstad motion or his mid-trial motion to dismiss or if he is raising an entirely separate appeal for insufficiency of the evidence. However, each would be reviewed under the same standard, so determining which motion he is appealing is not necessary.
[6] Although the record does not contain a transcript of the opening arguments, the record sufficiently supports the conclusion that Athan's defense strategy from the outset of the case was consensual sex. During cross-examination of several witnesses, Athan's attorney highlighted the possibility of a significant lapse of time between the sexual encounter and the murder, the possibility that Sumstad was a sexually active girl, and the lack of additional DNA evidence on the ligature. Finally, during closing arguments, Athan's attorney noted Athan was not charged with rape or assault. VRP (Jan. 20, 2004) at 92.
[1] In reaching this conclusion, I am not unmindful of those who rightfully question whether this court should establish precedent that allows the State to collect, test, and store materials containing a person's DNA without first securing a warrant on the theory that a person exposes those materials when he voluntarily exposes his body and bodily fluids to the public. As one commentator has noted, "`Everywhere we go, doing anything we do, we leave behind a trail of genetic evidence: cells that are naturally shed over time.'" Br. of Amicus Curiae ACLU at 9 (quoting Rachel Ross, A Trail of Genetic Evidence Follows Us All, Toronto Star, Feb. 2, 2004, at D03). It is for this reason that I agree with Athan that the voluntary "abandonment" theory is not applicable here. As the ACLU convincingly argues, a defendant leaving or discarding a tangible piece of property in a public place that others may find and examine is conceptually different from leaving our skin cells behind wherever we go in public. Id. at 7-8. Even so, in my view, Athan's knowing decision to send through the public mail system the letter containing his saliva is far different in nature than that routine shedding of hair, skin, and bodily waste that each of us engages in daily. Those latter incidents cannot be said to be conscious, voluntary actions in the same sense as Athan's actions here and the collection and testing of such items without valid authority of law could run afoul of our state constitution. However, those questions are not before us today.
[2] A person who is not an active member of the state bar and who holds himself out as entitled to practice law engages in the unlawful practice of law. RCW 2.48.180(2)(a). The unlawful practice of law "is a gross misdemeanor." RCW 2.48.180(3)(a). The unauthorized practice of law includes the act of permitting a member of the public to believe that one is authorized to give and would give legal assistance even though, in fact, no services are rendered and no fee charged. In re Disciplinary Proceeding Against Hawkins, 81 Wash.2d 504, 507, 503 P.2d 95 (1972). The actions of the investigating officers here in creating a fictitious law firm and a fictitious class action lawsuit and in holding themselves out to be counsel in that suit clearly led Athan, a member of the public, to believe the officers, though their positions as such were unknown to him, were authorized to give and provide him legal advice in this state. Consequently, I agree with the trial court that the officers involved here engaged in the unlawful practice of law.
[3] I agree with Justice Fairhurst's conclusion that James Athan's statement was offered to prove the truth of the matter asserted, and it was, therefore, hearsay.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[1] I, again, believe that Justice Thurgood Marshall was correct when he opined:

The heinous nature of the crime is no excuse . . . for condoning knowing and intentional police transgression of the constitutional rights of a defendant. If Williams is to go freeâ and given the ingenuity of Iowa prosecutors on retrial or in a civil commitment proceeding, I doubt very much that there is any chance a dangerous criminal will be loosed on the streets, the bloodcurdling cries of the dissents notwithstandingâ it will hardly be because he deserves it. It will be because Detective Leaming, knowing full well that he risked reversal of Williams' conviction, intentionally denied Williams the right of every American under the Sixth Amendment to have the protective shield of a lawyer between himself and the awesome power of the State.
Brewer, 430 U.S. at 408-09, 97 S.Ct. 1232 (Marshall, J., concurring).
[1] Article I, section 7 of the Washington Constitution states, "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law."
[2] The fourth amendment to the United States Constitution states, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
[3] Because I would conclude that article I, section 7 provides greater protection to Athan's privacy interest in his saliva and DNA, it is not necessary to reach the search and seizure inquiry under the Fourth Amendment. See State v. Surge, ___ Wash. ___, 156 P.3d 208, 218-19 (2007) (Owens, J., concurring).
[4] If we conclude that the government has intruded on a person's private affairs, we determine whether the government acted under authority of law. Myrick, 102 Wash.2d at 510, 688 P.2d 151. The state constitution generally requires law enforcement officers to obtain a warrant to intrude on a person's private affairs. Id. The only exceptions we recognize to the warrant requirement are "(1) consent; (2) exigent circumstances; (3) search incident to a valid arrest; (4) inventory searches; (5) plain view; and (6) Terry investigative stops." State v. White, 135 Wash.2d 761, 769 n. 8, 958 P.2d 982 (1998) (citing Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Hendrickson, 129 Wash.2d 61, 71, 917 P.2d 563 (1996)). Because the State does not assert that the detectives had a warrant or met one of the exceptions to the warrant requirement, the detectives did not act under authority of law.